Good morning, may it please the court. I'm James Laughlin and I represent the appellant Stephen Clemente. With the court's permission, I'd like to reserve two minutes of my time. Sure. Keep your eye on the clock. Thank you. I'd like to start out by acknowledging that Mr. Clemente faces a very substantial burden to show that there was insufficient evidence to convict him in this case, given that the evidence we're talking about is the eyewitness testimony of two police officers. Even though there wasn't any independent evidence corroborating those officers' testimony, this court would ordinarily defer to the jury's implicit credibility finding that they were, in fact, credible. What makes this case different and special is that even the officers themselves couldn't explain away the inconsistencies between the physical evidence and their testimony. Could you, and you've done a good job of laying out what the forensic evidence of the shells and the throw of the normal ejection pattern would show, but the question is that he was convicted of possession, was he not? Yes, Your Honor. And so both officers testified that they saw him with a gun in his hand. Yes, Your Honor. Correct. So how does the relevance of the ejection pattern play into that? That might go to the use, whether they actually saw him fired or the like, but how do we get around the each corroborate each other that they at least saw him with a gun in his hand? Your Honor, you are correct that they saw him with a gun in his hand, but if the circumstances that they describe surrounding their observations with him with a gun in his hand are proven to be physically impossible, I would submit that no rational jury could find the defendant guilty of even possessing the gun beyond a reasonable doubt. And again, this is not a case where we have... Even if they believe that he had a different gun in his hand when it was across the street? Your Honor points out a very significant problem. The indictment alleged the possession of this particular 9mm Luger. Okay. So if in fact...  Yes, yes. So Luger's the manufacturer, Lama's the model. Okay. But that's not a permissible inference to uphold the jury's verdict because if that in fact was the basis for the jury's verdict, that would conflict. There'd be a fatal variance in the indictment. And I think that as the government points out in its brief, the jury didn't deliberate very long in this case, and I think it's not hard to guess why. Clearly there was a lot going on that evening. There was somebody firing a gun in the parking lot. There was somebody different, we now know, firing from Western Avenue. I would submit that the evidence... We don't know if it was somebody different, but at least we're fairly confident it was a different weapon that was being used. Yes, Your Honor, we definitely know it was a different weapon, and I would submit given the officer's testimony that it could not have been Mr. Clemente firing a different weapon on Western Avenue. Officer Luna at pages 96 through 98 says, you know, it looked to me like he had one single gun the whole time. It never looked like he either changed the magazine or switched guns. And Officer Pierce, who did not see the initial firing of the weapon but looked up as soon as it happened, said he saw Mr. Clemente with a single gun in his hand the entire period of time. So I don't believe that it's a permissible inference from the officer's testimony that Mr. Clemente switched guns, except to the extent that clearly their testimony is just impossible. Mr. Clemente could not have fired the Luger on Western Avenue, we know that. And something else happened. Maybe he switched guns, maybe it was something completely different, but what's significant is it could not possibly have happened the way the officers said that it happened. And again, I'd like to point to Officer Luner's testimony on page 96 through 98, because I think that's the most significant testimony in the transcript. At that point, he acknowledges, he says, even as I recollected here today on the day of my testimony, this is how I remember it happening. I remember him firing the same gun on Western Avenue and in the parking lot. I know that can't possibly be the case because I know the ballistics evidence now, but that's still the way I remember it. So even he acknowledged that his recollections and observations were physically impossible, given the later ballistics evidence. All we have to have, though, is Mr. Clemente either firing the gun on Western Avenue or in the parking lot of the store. And either one of those would be sufficient, wouldn't it? That's true, and that's what the government tries to do, is try to shift the focus of the court over to the parking lot and says, you know, you can just ignore what happened on Western Avenue. But I don't think you can, because the government wants to treat it like it's two separate, distinct events, and they're not. They were separated only by a matter of seconds. And as I said, the officers' recollections were that they saw Mr. Clemente continuously, from the time of the first shooting to the time of the second shooting, with the same gun in his hand. They never lost sight of him. They lost sight of him a couple of times after the second shooting in the parking lot. But given that that's their recollection, I don't think the court can ignore the earlier proven and admitted impossibility of their testimony in deciding whether or not there was sufficient evidence to show that he possessed a gun in the parking lot. Again, what we have to show is that no rational jury could find beyond a reasonable doubt that Mr. Clemente fired the weapon. The police made a radio call in which they identified somebody who had a gun. And that description roughly corresponds to what Mr. Clemente was wearing that night, is that right? Remind me whether on the radio call, whether they identified the man as having a gun. I believe that they did identify. I know that they described what he was wearing, and I believe the word gun was used, although I'm confused. I may be thinking of the communications that were shouted between the two officers. We even have a record of a contemporaneous identification of someone wearing the same kind of clothes that Mr. Clemente was wearing on that night. Right. With the officers exclaiming, he's got a gun, we need backup. Right. And that's significant because we have never suggested that Officers Luna and Pierce are conspiring to plant a gun on our client or to lie against our client. The evidence suggests they're mistaken. And so while they did chase Mr. Clemente and ultimately catch him, they also mentioned that there were seven to ten people who were fleeing from the gunfire, who were running off in all different directions. And what the evidence suggests is a possible inference is that in that confusion, they mistook certain people for other people. But I don't want to suggest that we're going to show by the facts in the record that Mr. Clemente is innocent. Again, what we want to show is that the evidence currently in the record, particularly the testimony of the two officers, is insufficient for a rational jury to find beyond a reasonable doubt. They might suspect, they might find by a preponderance of the evidence, but I don't think a rational jury could meet that high standard of beyond a reasonable doubt. You didn't, your defense, you've been very candid with us here this morning, Mr. Laughlin. In your defense at the trial, you didn't attempt to offer any evidence of anybody else wearing an identical sweatshirt, that this was somehow gang colors or somebody had all been shopping at the Gap together or something. We don't have somebody else that looks like they're dressed like Mr. Clemente at the time. No, Your Honor. I see that I don't have much time left. You want to reserve? Why don't you reserve for your rebuttal? May it please the Court. My name is Jaime Guerrero, and I'm counsel for the appellee in this matter of the United States. I'd like to first respond to some of the issues raised by the Court in the questioning of the defense counsel. Initially, the question becomes whether or not the jury verdict should be upheld, in this case against the defendant, based on the observations of the officers. What the officers both stated during their testimony was, and this is undisputed, they could not shake them on this testimony, they saw the defendant running across the street with a semi-automatic gun. They both saw him in the parking lot firing that semi-automatic gun. They were both 15 yards away from the defendant when they saw him firing the semi-automatic gun. They both had their guns set on the defendant at the exact same time, yelling at the defendant to drop the gun. There's no dispute about that. There's one 9mm gun that was found. That was the one that both officers said they saw. They both saw the defendant running away from the scene of the shooting, and they never lost sight of him for more than a fraction of a second. And yet the ballistics is clear that this could not have been the weapon that was fired on Western Avenue when the officers first saw the gunfire. That is 100% correct, Your Honor. It's impossible. And even the officer will admit, the officer who first claimed in his report that he saw the defendant firing the gun on the other side of the street, he admits he didn't realize it. He realizes now it's impossible. He based his assumption, and it was a reasonable assumption, on the following facts. Did the officers ever identify the make or model of the gun in any of their testimony? They did not. All they said was it was a blue steel semi-automatic gun that they saw. And they both saw him throw it near where it was found, near the Camaro. And the officers who showed up afterwards found the one 9mm semi-automatic gun that was found that night. There was none other found. There were three other revolvers found in the vicinity and one inside of a banquet hall. It was the five casings because there were still four chambers, four bullets still left in the gun. I believe there were four casings that were found near the gun, or five near the gun, four inside the weapon, which meant that the magazine was full when it was initially shot. And there's no question that there was a shooting in progress. There's no question that on the radio transcript itself, during the process, the officers are yelling, radioing to the police station, shooting in progress, shooting in progress. Is it clear from the ballistics that the Luger that was found in the parking lot was the gun that was fired that night? Are there any bullet holes someplace else where they were able to match up the… No other bullet holes, but the casings that were found in the Minnie Mall parking lot near the gun were from that gun. Okay, they were from that gun, but that doesn't mean that the gun couldn't have been fired the day before. It does not mean that, Your Honor. But given the testimony of the officers of where the gun was found, and near where the casings were found as well, Your Honor, the government doesn't see any other way that this could have been presented to the jury in terms of the facts that were presented. That 9mm gun was the one that they had seen. It was the one that was found. It matched the description they gave over the radio when they were discussing it between themselves and to the main station, Your Honor. But with all of that certainty of their testimony, what's the explanation for the throw pattern, or the ejection pattern of the shells? The problem with that argument and the problem that the defense had brought up to the court is one that we acknowledge immediately. They were scattered in different areas near the Camaro, but that does not in and of itself explain that the gun wasn't fired in the direction the officers said. In fact, both officers said they would expect that, yes, the trajectory of the casings would fly to the right. They expected, but each gun is different. Some go up. Some go to the left. Some go back. Was the gun ever tested? It was never tested for trajectory, Your Honor. And they both also testified that they would not expect the casings to stand right where they fall. In fact, they hit the cement. They're round. They're going to bounce. They wouldn't expect them to fire in the same place. And further, this wasn't a… Yeah, but if it's ejecting to the right, it's not likely to bounce in a consistent pattern off to the left, would it? Not necessarily, Your Honor. But also, we have to remember that this crime scene, it was in flux at the time. People were leaving the parking lot. Cars were leaving at the same time. So as the governor argued during the closing arguments, reality is they were probably moved around. They were not in the same place where they were found when they first came out of the gun. And that's basically because there were cars leaving. There were people running out of Minnie Mall parking lot. We don't believe the trajectory in and of themselves. Because they were never tested makes any difference of whether or not the gun was fired in the direction the officer said they were. The indictment does pinpoint this luger, is that it? We did. The indictment pinpoints the night of the luger that was found underneath the Camaro that both officers said they saw the defendant holding and firing in the Minnie Mall parking lot. And the government believes it's important to remember that these officers saw him when they were 15 yards away from him. They both had eyewitnesses. They were both eyewitnesses. And the defense says there was nothing to corroborate the officer's testimony. There was. The gun was there and the case was masked that gun. If it had been just officers saying they saw him with a gun, there was no gun found, we'd have a harder case, obviously. The officer testified to how many shots were fired in the parking lot? They said four to five shots. And they said at that point, once they both pulled their guns out, they're both yelling, at that point the defendant looked back, both officers, they didn't know if the defendant saw the police car or them. But once he looked back and saw there was a patrol car parked there with the lights on, he threw the gun and immediately started running northeast down 35th Place Avenue. Did you address the sentencing issue here? There's an enhancement. Is it your contention that the jury necessarily found as part of the possession that they also necessarily had to find that he fired the gun? No, Your Honor. And I believe the district court noted this as well, that, in fact, the jury could have found only the fact that he possessed the gun and not the firing or the assault with a deadly weapon. We believe the government recommends, obviously, this court, defer ruling on the sentencing until after that on-the-block decision. We believe, even so, the fact pattern in this case is very dissimilar to most cases. First of all, the guideline sentence in this case was above the statutory maximum. The defendant actually got the benefit of the maximum. That's okay. We'll defer until then. There's no point in rehearsing that. And if there's no further questions, Your Honor, at this point the government would submit. Okay. Okay? Thank you, Your Honor. Unless the court has any further questions, I'd submit as well. Okay, fine. Thank you, counsel, both of you, for your arguments. The case just argued is submitted. The next case on calendar, United States v. Williams, has been moved to the Friday calendar. And so the next case we'll hear argument is United States v. Perez. Thank you.
judges: Browning, Fisher, Bybee